IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEGALFORCE RAPC WORLDWIDE P.C.,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS DEMASSA,<br><br>Defendant. | Case No. 18-cv-00043-MMC<br><br>**MEMORANDUM OF DECISION; FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

In this action, plaintiff LegalForce RAPC Worldwide, P.C. ("LegalForce") alleges defendant Chris DeMassa ("DeMassa") and persons he employs are engaging in the unauthorized practice of law, thereby violating § 17200 of the California Business & Professions Code.

On November 30, 2020, and December 1, 2020, the Court conducted a trial on LegalForce's claim against DeMassa. Wensheng Ma and Nicholas Craft of LegalForce appeared on behalf of LegalForce. Joyce Li and Andrew Jones of Durie Tangri LLP appeared on behalf of DeMassa. Having considered the evidence presented and the arguments of counsel, as well as the parties' posttrial filings,[1] the Court rules as follows.

//

---

[1] On December 9, 2020, DeMassa filed a "Motion for Judgment Under Rule 52(c), or, in the Alternative, under Rule 52(a)," which motion has been fully briefed. As a judgment under either Rule 52(a) or 52(c) must be supported by findings of fact and conclusions of law, see Fed. R. Civ. P. 52(a), 52(c), the Court will not separately rule on DeMassa's motion, but, rather, will address in the instant Memorandum of Decision the issues raised thereby.

**BACKGROUND**

LegalForce is a law firm that provides services to individuals and businesses seeking to register trademarks with the United States Patent and Trademark Office ("USPTO"). DeMassa, an individual doing business under the name Trademark Express, also provides such services. Neither DeMassa nor any of his employees is an attorney. In the operative complaint, the Second Amended Complaint ("SAC"), LegalForce seeks an injunction prohibiting DeMassa and his employees from continuing to operate Trademark Express in a manner that, according to LegalForce, constitutes the unauthorized practice of law.

**DISCUSSION**

Section 17200 prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice." See Cal. Bus. & Prof. § 17200. Here, LegalForce asserts Trademark Express is engaging in an "unlawful" practice, see id., specifically, the unauthorized practice of law in violation of 37 C.F.R. § 11.14, which regulation provides that "[i]ndividuals who are not attorneys are not recognized to practice before the [USPTO] in trademark . . . matters," see 37 C.F.R. § 11.14(b).[2]

**A. Statutory Standing**

The Court first considers whether LegalForce has shown it has standing to bring its § 17200 claim.

To have standing to seek relief under § 17200, a plaintiff must have "suffered injury in fact and . . . lost money or property as a result of the unfair competition," see Cal. Bus. & Prof. Code § 17204, and must establish those facts "by a preponderance of the evidence," see Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305, 1351 (2009).

Here, at trial, Raj Abhyanker ("Abhyanker"), the sole owner of LegalForce, testified the gross revenue LegalForce earned from its trademark practice "decreased from 2015

---

[2] All other claims asserted in the SAC have been voluntarily dismissed by LegalForce or summarily adjudicated against it.

2

to 2019" (see Transcript of Zoom Video Bench Trial Proceedings ("Tr.") 27:10-13, 73:4-9, 74:8-15) and that it has had to "charge less" in the "face of competition" (see Tr. 32:2-3). As discussed below, however, there is no evidence linking any such decrease[3] to Trademark Express.

Both Trademark Express and LegalForce have been providing trademark services for a considerable period of time, Trademark Express since 1993 (see Tr. 236:19-25) and LegalForce since 2005 (see Tr. 27:9-17). LegalForce, however, has not offered evidence to support a finding that any decrease in business it began experiencing in 2015 is the result of the continued presence of Trademark Express, as opposed to general market conditions.[4] LegalForce offered no evidence, for example, that Trademark Express, in or around 2015 or thereafter, changed its business practices, revised its marketing efforts, or lowered its prices, evidence which might, arguably, have supported a finding that any revenue LegalForce lost was realized, at least in part, by Trademark Express.

Indeed, with respect to pricing, it is undisputed that the prices charged by Trademark Express have always been hundreds of dollars higher than those charged by LegalForce. (See Tr. 65:24-66:4; Tr. 208:19-24; Tr. 210:23-211:5.) Consequently, to the extent LegalForce claims it had to lower its prices, LegalForce fails to show any revenue lost thereby is attributable to Trademark Express.

To the extent LegalForce argues it has lost customers to Trademark Express, such argument likewise is unavailing. In support thereof, LegalForce relies on DeMassa's trial testimony, in particular, that, "over the last ten years," but "less lately," he has heard complaints about LegalForce, including that "[t]hey are a horrible service" and

---

[3] No testimony or other evidence was provided as to the amount thereof.

[4] One such condition, as Abhyanker acknowledges, is competition from multiple other entities providing trademark services, and LegalForce has sued at least seven of them, including its two "biggest" competitors, namely, LegalZoom and Trademark Engine, as well as TTC Business Solutions, Greenside, MyCorporation Business Services, and FileMy, LLC. (See Tr. 136:9-137:9; 137:13-138:14; 141:4-15); see also Tr. 137:10-12 (acknowledging Iocab as additional competitor, but lacking recollection as to whether it was sued).)

3

"[t]hey don't do any research" (see Tr. 392:5-16), that persons who made such complaints had contacted Trademark Express, either by telephone or email, because they were "trying to fix their trademarks that were botched by Trademarkia"[5] and "would have to refile another name usually" (see Tr. 392:21-393:1), and that "some" or, perhaps, "most" of those persons became Trademark Express customers (see Tr. 393:11-12).

Given the unspecified time frame within which any such contacts occurred, and the lack of other evidence as to when any former LegalForce customer became a customer of Trademark Express, however, the Court lacks sufficient evidence to find any of the above-referenced complaining individuals became Trademark Express customers within the applicable limitations period, namely, on or after January 3, 2014.[6]

Of equal or greater importance, there is insufficient evidence that any such individuals ceased being customers of LegalForce as a result of Trademark Express's assertedly unauthorized practice of law. Rather, the more reasonable inference is that those customers left LegalForce as a result of their dissatisfaction with the service they received from LegalForce and that they were no longer customers of LegalForce when they began searching for assistance from some other provider. Indeed, LegalForce offered no evidence to support a finding that any such former customer, in the absence of Trademark Express, would have returned to LegalForce, as opposed to seeking assistance from one of its competitors. See Kwikset Corp. v Superior Court, 51 Cal. 4th 310, 326 (2011) (holding "plaintiff's economic injury" must be "caused by" claimed unfair business practice).

In sum, the Court finds LegalForce has failed to establish its claimed losses occurred as a result of the alleged unauthorized practice of law by DeMassa and Trademark Express employees.

---

[5] "Trademarkia" is a website owned by LegalForce. (See Tr. 88:15-19.)

[6] Section 17200 claims are subject to a four-year statute of limitations. See Cal. Bus. & Prof. Code § 17208. LegalForce's initial complaint was filed January 3, 2018.

4

1    Accordingly, DeMassa is entitled to judgment on LegalForce's claim.

2    **B.  Liability**

3    Although, as noted, LegalForce's claim fails for lack of standing, the Court, as set forth below, also finds DeMassa is entitled to judgment for the reason that LegalForce has failed to prove by a preponderance of the evidence that DeMassa has either engaged in or is engaging in the unauthorized practice of law.

As noted above, LegalForce alleges Trademark Express is engaging in the unauthorized practice of law in violation of 37 C.F.R. § 11.14.  See 37 C.F.R. § 11.14(b) (providing "[i]ndividuals who are not attorneys are not recognized to practice before the [USPTO] in trademark . . .  matters").

The practice of law is often understood to mean "performing services in a court of justice in [a] matter [ ]pending therein throughout its various stages and in conformity with the adopted rules of procedure."  See Baron v. City of Los Angeles, 2 Cal. 3d 535, 542 (1970) (internal quotation and citation omitted).  "[I]n a larger sense," however, "it includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured," irrespective of whether a lawsuit has been filed.  See id. (internal quotation and citation omitted).

In any event, courts have recognized that "ascertaining whether a particular activity falls within this general definition may be a formidable endeavor," see id. at 543, and in "close" cases, have "determined that the resolution of legal questions for another by advice and action is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind," see id. (internal quotation and citation omitted).  "What is a difficult or doubtful question of law is not to be measured by the comprehension of a trained legal mind," however, but "by the understanding thereof which is possessed by a reasonably intelligent layman who is reasonably familiar with similar transactions."  See Gardner v.

//

//

Conway, 234 Minn. 468, 481 (1951).[7]

Here, the basic nature of the services provided by Trademark Express is not disputed. Persons who seek to file with the USPTO an application to register a mark, or to renew a previously registered mark, contact Trademark Express by telephone or email. Trademark Express employees then assist those customers in preparing their applications and, after the customers submit those applications to the USPTO, Trademark Express employees assist them in responding to any "Office actions" they receive from the USPTO. (See Tr. 182:18-183:3; 184:4-185:4; 191:19-25.) In the course of providing such services, Trademark Express performs a "comprehensive search" of "multiple databases" to find "possible conflicts and similarities" with the customer's proposed mark (see Tr. 186:4-11), and prepares a report (see Tr. 186:19-21), after which the customer is referred to an attorney (see Tr. 189:18-20), who reviews the search results with the customer and is otherwise available to answer questions the customer may have (see Tr. 282:9-14; 283:17-284:19).[8]

LegalForce contends the manner in which Trademark Express employees assist customers in preparing applications and renewals, as well as in responding to Office actions, constitutes the practice of law. Additionally, Legal Force argues, the manner in which Trademark Express employees perform searches and create a report containing the results thereof constitutes the practice of law. The Court addresses in turn the actions by Trademark Express that LegalForce asserts constitute the practice of law, beginning with the searches and preparation of search reports.

//

---

[7] In their respective written submissions, both parties cite to state court decisions that have endeavored to define the practice of law.

[8] Trademark Express maintains a list of attorneys to whom customers are referred. (See Tr. 187:13-24.) The attorneys are not employed by Trademark Express (see Tr. 187:13-21) but, for at least some portion of the consultation, either do not charge Trademark Express customers or charge them a reduced rate (see Tr. 156:7-10; 162:15-24).

**1. Search**

Trademark Express employees review over 6500 databases to attempt to "find[ ] anything that may affect a client in sound, appearance or meaning." (See Tr. 259:2-4.)[9] The report resulting from such research, which consists of a "list of similar marks," the "goods and services" associated with those marks, the "owner" of those marks, and "other kinds of information" (see Tr. 160:13-161:7), can be as short as "8 pages to 12 pages" (see Tr. 158:12-17) or as long as hundreds of pages in length (see Tr. 186:19-22; 259:4-5), and, along with a "summary page," is sent to the customer as well as the attorney to whom the customer has been referred, so that the customer and the attorney can "discuss the findings of the research" (see Tr. 186:22-25).[10] Thomas Cook ("Cook"), an attorney to whom Trademark Express has referred customers, testified that, prior to discussing with a client the search results prepared by Trademark Express, he would first review the results attached to the summary page,[11] then provide the client with "an analysis of the search results," and thereafter send a "confirming invoice" that summarized the advice he had provided. (See Tr. 168:20-170:9.)

There is no dispute that Trademark Express employees who perform the searches are not engaged in purely clerical work. (See Tr. 311:18-312:7 (DeMassa's acknowledgement that it "takes a year to learn this job" and "it's not clerical").) The expertise required is not legal expertise, however, but, rather, skilled work traditionally performed by non-attorneys (see Tr. 105:11-21 (Abhyanker's acknowledgement that

---

[9] DeMassa explained that, at a "Thompson & Thompson" class he took when he began his business (see Tr. 231:17-232:12), he was taught that trademarks "provide protection, [i.e.,] ownership rights, based on sound, appearance, and meaning" (see Tr. 296:12-16.)

[10] There is no evidence that Trademark Express employees speak to customers about search results or, in any manner, offer customers advice regarding the results.

[11] Cook testified that Trademark Express "generates a list of similar marks, much as all search companies do" (see Tr. 160:9-17), and that he performs his own review of the results and does not rely on the summary page, explaining the summary is "not very helpful to [him] to provide advice to a prospective client because it doesn't have the information [he] need[s]" (see Tr. 159:3-6, 160:21-161:19).

7

LegalForce has "non-attorneys, as do[es] every firm and even the USPTO itself, to do the searches"), who provide to attorneys information those attorneys then use in providing legal services (see Tr. 105:11-13 (Abhyanker's explanation that "an attorney can make an evaluated decision on the basis of the search results"); Tr. 158:2-11, 169:22-25 (Cook's explanation as to how he uses "search results" prepared by Trademark Express when he advises clients)).

Accordingly, the Court finds LegalForce has failed to show DeMassa or Trademark Express employees, by searching databases and compiling the results into a list, are engaging in the practice of law.

### 2. Completing Application/Renewal Forms

#### a. Trademark Application

To apply for trademark registration from the USPTO, an applicant completes a USPTO form titled "Trademark/Service Mark Application, Principal Register." (See Def.'s Ex. I.)

Courts have recognized that a non-attorney's act of assisting a customer in filling out a standard form is not the practice of law where the customer, rather than the non-attorney, controls the content of the answers provided on the form. See, e.g., Real Estate Bar Ass'n v. National Real Estate Information Services, 459 Mass. 512, 525 (2011) (holding preparation of "standardized forms" for clients "does not constitute the practice of law," where clients provide information to defendant, who enters it into forms, and "ultimate control over and responsibility for the contents of those forms rests with [the] clients"). By contrast, where a non-attorney, in assisting a customer in completing a form, "invoke[s] his professional judgment in applying legal principles to address his customers' individualized needs," the non-attorney is engaged in the "unauthorized practice of law." See, e.g., Taub v. Weber, 366 F.3d 966, 970 (9th Cir. 2004) (internal quotation, alteration, and citation omitted) (holding non-attorney who assisted customer in completing form engaged in unauthorized practice of law by answering question on form in manner different from that directed by customer and who, when asked by customer to

1  change answer, relied on own understanding of law and "refused" to do so).

2       Here, LegalForce argues the evidence presented at trial establishes that, when
3  assisting a client in completing an application, Trademark Express employees give
4  customers legal advice.

5       In that regard, the undisputed evidence is that Trademark Express employees,
6  when customers seek assistance in completing forms, obtain the customers' "contact
7  information, the name they want to trademark, and the goods and services they will be
8  selling to the public" (see Tr. 184:24-185:4), as well as the customer's "entity type" (see
9  Tr. 206:7-17), e.g., "individual" or "corporation" (see Def.'s Ex. I-2), all of which
10 information must be provided on the application (see Def.'s Ex. I (USPTO application
11 form); see also Tr. 396:18-19) (DeMassa's testimony that "the client gives us the
12 information, we put it there")).  Trademark Express also asks whether the customer
13 presently is using the mark or, if not, intends to do so (see Tr. 189:12-17, 190:3-5,
14 206:13-17), and if the customer states the mark presently is in use, Trademark Express
15 asks the customer "how long they've been using the name" (see Tr. 189:15-17),
16 specifically, the date when the customer "first use[d] the name anywhere" and "in
17 commerce" (see Tr. 315:12-14), all of which information likewise must be provided on the
18 application (see Def.'s Ex. I-8).  Additionally, the customer is asked to provide a
19 "specimen" that shows the mark is "prominently displayed" (see Tr. 205:16-25), a
20 document that must be attached to the application (see Def.'s Ex. I-8).

21      LegalForce argues Trademark Express nonetheless is engaged in the practice of
22 law because, according to LegalForce, Trademark Express, in the course of obtaining the
23 above information, also informs customers as to whether a proposed mark is
24 trademarkable, how goods and services should be described on the application, and
25 what type of specimen the USPTO is likely to find acceptable.[12]

---

[12] LegalForce makes no argument as to the other types of information Trademark Express obtains, namely, contact information, entity type, date of first use of the mark, date of first use of the mark in commerce, and whether the customer, if not presently

1  The record, however, does not establish that DeMassa or any Trademark Express employee has advised any customer that a proposed mark constitutes a design or words that cannot be trademarked.  Rather, LegalForce submits a screenshot of Trademark Express's website, which includes a section titled "Descriptive Trademarks," stating "descriptive words are not typically allowed to be registered on the USPTO's Principal Register" and providing a hyperlink to what appears to be another webpage.  (See Pl.'s Ex. 51.)[13]  Making such general statements in a publication is not the practice of law.  See, e.g., Florida Bar v. Brumbaugh, 355 So. 2d. 1186, 1193 (Fla. 1978) (holding "instructional material should be no more objectionable than any other publication placed into the stream of commerce which purports to offer general advice on common problems and does not purport to give a person advice on a specific problem particular to a designated or readily identifiable person").

Similarly, the undisputed evidence is that Trademark Express does not suggest to customers how to describe their goods and services, nor does it change the goods and services information provided by customers, except where an attorney has recommended that the customer provide a different description.  (See Tr. 188:10-16; 205:1-15.)  Although DeMassa testified that he and his staff put the information provided by customers into "sentence form" (see Tr. at 253:16-20 (offering, as example, "putting in sentence form" what looked like "a shopping list of things" provided by customer)), any such essentially clerical revision to comply with USPTO-required format is not the practice of law.

//

---

using the mark, intends to do so in the future.

[13] Although LegalForce submits an exhibit reflecting an online comment by a customer, to which DeMassa posted a response that "there were descriptive issues with the particular name you wanted to trademark" (see Pl.'s Ex. 65), DeMassa explained that the referenced "descriptive issues" were identified by Cook, an attorney (see Tr. 377:7-18).  He also testified that when he takes an order and believes the mark may be "really descriptive," he refers the customer to an attorney.  (See Tr. 383:4-7.)

10

1   Next, with respect to specimens, the undisputed evidence is that the information
2   Trademark Express elicits from its customers is, like the description of goods and
3   services, information requested on the application itself.  (See TR 190:6-14 (Dione Di
4   Lascio's ("De Lascio")[14] testimony that Trademark Express asks customers for "picture
5   proof that the name they want to trademark is being used in commerce"; explaining
6   customer who sells clothing on website should provide specimen that shows name as
7   actually used on website and clearly shows clothing is being sold on website); Tr. 342:3,
8   12-18 (DeMassa's testimony that specimen submitted by customer "need[s] to
9   demonstrate goods or services"; explaining customer who sells clothing should have "a
10  picture of a garment with a hang tag or label"); see also Def.'s Ex. I-8 (USPTO application
11  form directions stating "specimen must show the mark as actually used in commerce";
12  providing, as examples, "tags, labels, instruction manuals, containers, and photographs
13  that show the mark on the actual goods or packaging," as well as "[w]ebpages . . . when
14  they include a picture or textual description of the goods associated with the mark and
15  the means to order the goods")).  It is also undisputed that, if the customer does not
16  understand what the USPTO requires in a specimen, Trademark Express "send[s] them a
17  video from the USPTO explaining specimens" (see Tr. 342:6-7), which, again, is
18  information provided by the USPTO on the application form itself (see Def.'s Ex. I-8 (form
19  directing applicant to "[w]atch the TMIN Specimen video explaining what is an
20  appropriate trademark or service mark specimen for a good or service")), and, if the
21  customer still has questions, the customer is "refer[red]" to "one of the attorneys" (see Tr.
22  342:10-11).

   Accordingly, the Court finds LegalForce has failed to show DeMassa or Trademark
   Express employees are engaging in the practice of law when they assist customers in

---

[14] Di Lascio has worked for Trademark Express since 2015 or 2016, and first worked "in sales," then "in customer service," and later as the office manager.  (See Tr. 181:14-16, 182:1-9.)  She presently works part-time for Trademark Express (see Tr. 181:4-7), as do all Trademark Express employees (see Tr. 239:19-240:2).

11

completing the USPTO's application for trademark registration.

### b. Renewals

Trademark registrations "remain in force for ten years from their date of issuance or the date of renewal, and may be further renewed for periods of ten years, unless previously cancelled or surrendered." See 37 C.F.R. § 2.181(a)(2). Additionally, to maintain a registration during the initial ten-year term, the owner of the mark must file with the USPTO, "on or after the fifth anniversary and no later than the sixth anniversary after the date of registration," an "affidavit or declaration of continued use or excusable nonuse," or "the registration will be cancelled." See 37 C.F.R. § 2.160(a).

It is not disputed that some customers of Trademark Express seek assistance with renewals. (See Tr. 182:22-183:2.) LegalForce contends Trademark Express, when assisting customers in completing a renewal application, gives customers legal advice.

In that regard, Trademark Express has submitted evidence that its process for assisting a customer in completing a renewal application is "almost identical" to its process for "the regular trademark application." (See Tr. 208:10-12.) In particular, Trademark Express provides the customer with the information the customer previously submitted to the USPTO at the time of initial registration, after which the customer "let[s] [Trademark Express] know if they need to update their ownership information or contact information" or change "the entity type they want to file under." (See Tr. 197:20-198:16, 208:10-16.) Additionally, the customer is asked for a specimen (see Tr. 198:2-3), and Trademark Express "just check[s] that it's an updated specimen" (see Tr. 200:1-3), and "that [the] name is prominently displayed, that the goods and services are clearly listed, and that they're able to be purchased by any person in the public" (see Tr. 200:7-11). No testimony has been submitted to the contrary, and, for the reasons stated above with respect to the initial application, the above type of interaction with customers does not constitute the practice of law.

Accordingly, the Court finds LegalForce has failed to show DeMassa or Trademark Express employees are engaging in the practice of law when they assist customers in

1  completing renewal applications.

### 3. Office Actions

If, after the USPTO examines a trademark application, "the applicant is found not entitled to registration for any reason," the applicant is "notified and advised of the reasons therefor," see 37 C.F.R. § 2.61(a), and is provided an opportunity to file a response to such an "Office action" within six months, see 37 C.F.R. § 2.62(a).  Similarly, if a "renewal application is not acceptable, the [USPTO] will issue a notice stating the reason(s) for refusal," see 37 C.F.R. § 2.184(a), and the registrant is provided an opportunity to respond to the notice within six months, see 37 C.F.R. § 2.184(b).

It is not disputed that some applicants who receive Office actions ask Trademark Express for assistance in responding (see Tr. 211:23-212:4), and Trademark Express then "help[s] [those] customers handle" them (see Tr. 191:17-25).  LegalForce argues that, in providing such assistance, Trademark Express employees are engaged in the practice of law.

Office actions are issued for a number of different reasons, four of which have been identified and discussed on the record presented.

As to two of those reasons, "likelihood of confusion" with another mark (see Tr. 191:13-15; 336:16-24) and the need for "clarification on goods or services" (see Tr. 193:3-4), the evidence is undisputed that Trademark Express refers the matter to an attorney and no other assistance is provided by Trademark Express (see Tr. 191:15-16, 194:11-24, 336:25-337:4).

Next, where the USPTO states a "new specimen is needed" (see Tr. 193:4), the undisputed evidence is that Trademark Express's process in "helping a client respond" is "very similar" to its process with respect to initial applications, as described earlier herein, the one minor difference being that the customer may be asked by Trademark Express to "provide additional specimens" (see Tr. 206:18-207:3).

Lastly, where an Office action "requests that a certain word be disclaimed" (see Tr. 193:5), i.e., where "the examining attorney . . . cite[s] a specific word in the name that

United States District Court
Northern District of California

can't be officially trademarked because it's a general word that can be used by the public" (see Tr. 193:10-12), the undisputed evidence is that Trademark Express asks whether the customer wishes to challenge the USPTO's determination or accept it (see Tr. 213:12-15).  It is further undisputed that a customer who wishes to contest the determination is "referred directly to [an] attorney" (see Tr. 213:7-11), and, if the customer does not wish to contest the determination, Trademark Express assists him/her in filling out a USPTO disclaimer form, after which the customer sends the completed form to the USPTO (see Tr. 212:11-213:3).[15]

Accordingly, the Court finds LegalForce has failed to show DeMassa or Trademark Express employees are engaging in the practice of law when they assist customers in responding to Office actions.

## CONCLUSION

For the reasons stated above, the Court finds DeMassa is entitled to judgment in his favor.

**IT IS SO ORDERED.**

Dated:  April 6, 2021

MAXINE M. CHESNEY
United States District Judge

---

[15] To the extent LegalForce contends Trademark Express routinely advises customers to accept disclaimers, its argument is unpersuasive.  In particular, LegalForce relies on the testimony of Di Lascio, who, when asked if it was "the standard practice to just accept the disclaimer," answered, "[f]rom my knowledge, yes."  (See Tr. 194:5-7.) The Court, however, understands Di Lascio's response, when read in context, to mean customers routinely decide to accept disclaimers, not that Trademark Express has a standard practice of advising customers to do so.  (See Tr. 213:4-214:4.)